No. 20,028.

ADA MAY BATTON, ET AL. *v.* ROXIE LEE MASSAR.
(369 P. [2d] 434)

Decided March 5, 1962.

Messrs. QUIAT, SEEMAN, QUIAT and WOODS, for plaintiff in error.

Mr. TERRY J. O'NEILL, for defendant in error.

*In Department.*

Opinion by MR. JUSTICE HALL.

WE will refer to the plaintiffs in error either as the adopters, the grandparents, or by name, and to the defendant in error as the mother.

On December 13, 1960, the trial court in separate cases entered final decrees of adoption whereby the adopters, husband and wife, were permitted to adopt as their own,

their grandchildren, Terri Lynn Batton, born January 19, 1957, and Richard Allan Batton, born August 25, 1958. These children are the offspring of the mother and her former husband, Ralph Dale Batton, who is the son of the adopters. An amended decree was entered on February 27, 1961. This amended decree was entered for the reason that it appeared there might be some question as to whether the decree of December 13, 1960, had been entered prematurely — prior to the time specified in the published "NOTICE AND SUMMONS IN ADOPTION" requiring the father to answer the petition for adoption.

On May 19, 1961, the mother filed in the trial court her "MOTION TO VACATE DECREES OF ADOPTION," advancing as reasons therefor the following:

(a) that the "Relinquishment of Rights and Consents to Adoption" signed by the mother are invalid, having been obtained by fraud, misrepresentation, misconduct of an adverse party, undue influence, and coercion.

(b) that said *consents,* which do bear her signature, are invalid because at the time she signed she was in a state of mental depression, a condition known by the adopters and by them exploited to get her signature, and that by reason of said condition she was unable to "fully comprehend or understand the nature or effect of her action or to execute any valid consent."

(c) that at the time she signed the CONSENTS she was a minor (age twenty years, ten months, and six days), and could not legally consent or waive her right to notice of hearing on the petition for adoption.

(d) that at the time she signed the CONSENTS she had received no advice or counseling from the court or from any other source, except such as she received from the adopters and their attorney, and that the advice and counseling so received was misleading, erroneous and fraudulent.

(e) that at the time the decrees of adoption were entered there had been no proceedings or decrees for

relinquishment of the children, and that consent to adoption by a minor without relinquishment is invalid.

Hearing was had on the mother's motion. Evidence was presented by the parties, at the close of which the trial court made extensive findings, pointing out apparent conflict in the statutes.

The only pertinent finding of fact made by the court is as follows:

"The mother in this case signed a consent for the adoption when she was a minor. It is the opinion of this court that at the time of the signing of the consent she did not realize the seriousness and finality of the papers she was signing, and in view of these circumstances, filed the motion to set aside the adoption."

Judgment was entered setting aside the adoption decrees.

The adopters are here by writ of error seeking reversal.

We find little dispute in the evidence with reference to facts material and necessary to a resolution of issues before us.

In 1959, the mother was named as a defendant in a divorce action brought by her then husband, Ralph Dale Batton. In that action the husband was granted a divorce, the mother was granted custody of the two children above mentioned, and the husband agreed, or was ordered, to contribute to the support of the children.

Batton soon remarried and disappeared, having paid little, if anything, for the support of his children. The mother soon married Massar, her present husband, and had a child by him.

On July 14, 1960, the mother, her two children by Batton, her new husband, and the new baby were living in a trailer in Denver. Living quarters were cramped, finances low, the trailer and furniture were in danger of being repossessed, and the mother feared there was some problem between her and her new husband, but there really was not, "it was all in my mind."

Under the strain of such conditions the mother called the adopters by telephone, seeking to learn the whereabouts of her former husband; she wished to locate him to get the ordered support for the children. As a result of this call she was invited by Mrs. Batton to come to the Batton's home and discuss her problems. This she did, taking the two Batton children with her.

As a result of that discussion, it was agreed that the adopters would then take the two Batton children. That evening they went over to the mother's trailer home and picked up the children and their clothing and took them to their home.

About ten days later the Battons told the mother that they could not keep the children on a permanent basis unless they had legal papers or papers of adoption. There is a dispute as to whether the word "adoption" was used or only the words "legal papers."

At that time the mother said she wanted to think it over and she did, for about two weeks, and then stated to the Battons that their proposal to keep the children was satisfactory.

The Battons then contacted a lawyer to whom they explained everything, as they understood it. After the lawyer explained matters to them they directed the lawyer to prepare papers for the adoption of the two children. The Battons notified the mother of their visit with the lawyer and the three agreed to meet at the lawyer's office on the next day, August 4, 1960.

Pursuant to this arrangement the Battons appeared at the mother's trailer home and took her by automobile to the lawyer's office. There adoption papers were prepared, the effect of adoption was, according to the lawyer's testimony, by him fully explained to the mother and the adopters. The Battons assured the mother that she could always see and visit with the children; the lawyer suggested this privilege could be put in writing if the mother so desired. No such writing was ever made or requested.

At that time the lawyer presented to the mother two papers for her signature — these were filled-in forms for "RELINQUISHMENT OF RIGHTS AND CONSENT TO ADOPTION," one for the adoption of each child. The mother read these filled-in forms, the meaning and purpose thereof was explained to her, and she signed them before a notary public. She was given a copy of each form signed.

On October 27, 1960, the grandparents filed petitions for adoption of the two children. On the same day "MOTION TO PUBLISH NOTICE AND SUMMONS," supported by affidavit, was filed and an order directing publication was issued. Pertinent portion of the order is as follows:

"IT IS ORDERED * * * that publication of Notice and Summons be had upon the following, to wit: RALPH DALE BATTON [father of the children] and to any other person or agency having any interest in this matter, by publication in the COLORADO DEMOCRAT * * * ."

Publication was had and Notice and Summons mailed to Ralph Dale Batton at his last known address.

Hearing was had on Battons' petitions for adoption on December 13, 1960, and final decrees of adoption entered. An amended final decree was entered February 27, 1961. The final decrees of adoption recite facts showing full compliance with statutory requirements for adoptions by grandparents.

The mother was given no notice and had no knowledge of any hearing or decree.

The mother visited the children at the adopters' home every Saturday from July 14, 1960, until February 1961. On the last mentioned date she, her husband and baby moved to Texas.

The mother came back to Denver in March to pick up the family truck and, before returning to Texas, briefly visited the adopters and children.

On the night of April 28, 1961, the mother called the adopters from Texas by telephone; the call was an-

swered by Mrs. Batton who told her that the children were fine. The mother then stated she wished to talk to the children, whereupon Mr. Batton was put on the 'phone and, according to the mother's testimony, he told her, in response to her request to talk to the children: "I'll have to ask you not to come and see the children or call them anymore." However, Mr. Batton testified that, in response to her stated desire to talk to the children, he said: "No, I didn't think it was — That's all I got out." He denied her statement, saying he never got further than the above quoted language, at which point she screamed and dropped the 'phone and her husband came to the 'phone and said: "I'll see you in court." The following morning she contacted her lawyer in Denver and the motion to vacate the decrees was filed May 19, 1961, and the decrees vacated July 17, 1961.

It is not entirely clear from the "Findings and Order" vacating the decrees of adoption as to the exact ground on which the judgment was predicated — whether lack of a valid consent or the minority of the mother.

■ Consent is necessary in all adoptions. Without a valid consent courts are without jurisdiction to enter a decree of adoption. *Storey v. Shumaker,* 131 Colo. 131, 279 P. (2d) 1057; *Foley v. Carnesi,* 123 Colo. 533, 232 P. (2d) 186.

■ The record is devoid of evidence of fraud, coercion, undue influence, misrepresentation or misconduct on the part of the adopters or their attorneys. The court made no finding that any of these alleged grounds for setting aside the decrees had been proven, but did state that: " * * * It is the opinion of this court that at the time of the signing of the consent she did not realize the seriousness and finality of the papers she was signing, * * * ."

We find nothing in the record before us to warrant such a finding. There is nothing to indicate that the mother was lacking in understanding and she was fully advised as to the consequences of her consent to the

adoption. Her only concern then apparently was whether she could visit the children. She was assured that she could, and the lawyer even suggested that she could have a letter from the adopters so stating, but she presumably did not feel that such was necessary or advisable.

Even though the evidence were such as to warrant the finding made, the facts recited therein are not sufficient ground for setting aside the decrees of adoption.

■ It is not the law that one may avoid the consequences of his voluntary acts, acts not induced by fraud, duress, coercion, etc., by proof that he or she: "did not realize the seriousness and finality of the papers she [or he] was signing." Such a rule of law would render every contract voidable at the whim of the maker.

It is most evident that subsequent events caused the mother to change her mind. Having given her consent, and it having been acted upon and decrees of adoption entered, her change of mind was ineffectual.

There remains one other question for resolution, going to the contention that the consent of a minor is ineffectual and void and that there can be no valid adoption without a valid consent.

■ C.R.S. '53, 4-1-6 (3), dealing with consents to adoptions, provides:

"The minority of a natural parent shall not be a bar to such parent's consent to adoption, and the adoption shall not thereby be invalidated, *provided, a court of competent jurisdiction has decreed the relinquishment of said child and affirmed subsequent adoption.*" (Emphasis supplied.)

The underlined portion above quoted is meaningless when considered in connection with another portion of said section, 4-1-6 (g), which specifies who may consent to the adoption of children who have been relinquished, wherein it is provided:

"The board of control of the Colorado state children's home or the superintendent of said home or the execu-

tive head of any public welfare department or of any licensed private child care or placement institution or agency which through court action or voluntary relinquishment has been given the care, custody and control of the person to be adopted including the right to consent to such adoption."

█ If there has been a relinquishment, then in proceedings for the adoption of the relinquished child the parent does not consent. In such case the agency to which the child has been relinquished is the only one that can consent. The parents in such case have by court decree been divested of all of their legal rights and obligations to said child. C.R.S. '53, 22-5-6. They have no control over the child or the adoption proceedings, notice to them is not required, their consent, if given, is meaningless. In most such cases they never know of the adoption proceedings or who may be the adoptive parents, if any — wisely so.

In determining the intent of the legislature in enacting C.R.S. '53, 4-1-6 (3), we conclude and hold that the meaningful portion thereof, to wit:

"The minority of a natural parent shall not be a bar to such parent's consent to adoption * * * ," expressed the intent of the legislature, and that the other meaningless words are surplusage and no evidence of a contrary intent.

Our conclusion is further fortified by the fact that the legislature, at the same time it adopted 4-1-6 (3), adopted the relinquishment statute, C.R.S. '53, 22-5-6, which provides that minors are competent to relinquish their children to a state agency.

█ In relinquishing children the parents do not have the slightest idea as to who, if anyone, shall become the adoptive parents. The legislature having recognized the competence of minors to make such a decision in relinquishment proceedings, it would seem that a *fortiori* they intended that a minor should be competent to consent to a child's adoption by specified relatives or speci-

fied strangers whom the minor has opportunity to investigate and whom the court must investigate before entering a decree of adoption.

The judgment is reversed and the cause remanded with directions to enter an order denying the motions to vacate the adoption decrees.

MR. CHIEF JUSTICE DAY and MR. JUSTICE PRINGLE concur.