513 P.2d 1350

Herlinda Marie ACEDO, Appellant,

v.

STATE of Arizona, DEPARTMENT OF PUBLIC WELFARE, Appellee.

No. 1 CA–HC 30.

Court of Appeals of Arizona, Division 1, Department B.

Sept. 25, 1973.

Thomas & Udall, by Stephen G. Udall, Flagstaff, for appellant.

Gary K. Nelson, Atty. Gen., by Harold J. Merkow and Joseph C. Richter, Asst. Attys. Gen., Phoenix, for appellee.

OPINION

HAIRE, Judge.

The only issue presented by this appeal is whether a natural mother, who voluntarily executes a consent authorizing the placement of her child for adoption, may regain her child after the child has been

placed in an adoptive home, solely upon the ground that at the time she signed the requisite consent form she had an unexpressed misconception as to the form's legal significance, which misconception was not the result of any improper actions on the part of the adoption agency. We hold that on the facts here presented, she may not.

The natural mother, hereinafter referred to as petitioner, filed a habeas corpus petition in the trial court, seeking the return of her baby. The evidence shows that the child was born on February 3, 1972 to petitioner, an unmarried woman, who at that time was 18 years of age and a high school graduate. Prior to the child's birth, petitioner had gone to the County Department of Public Welfare, hereinafter referred to as the adoption agency, at which time she decided that it would be best for the unborn baby to give it up for adoption. After the birth of the baby she changed her mind and decided to keep the child.

Petitioner and the baby resided at the home of petitioner's parents until about August 13, 1972, when, although unemployed and in possession of only $20, she moved out of her parents' home, taking the baby with her. On August 14, 1972, only one day after moving, she made another visit to the adoption agency, where the possibility of adoption was again discussed. On August 15, 1972, a welfare worker went to petitioner's temporary residence to discuss the adoption. Petitioner at that time stated that she wanted to place the baby for adoption, and thereafter petitioner accompanied the welfare worker back to her office.

At the office, petitioner was given a "Consent to Place Child for Adoption" form to read, and after reading it was asked if she understood it. She responded that she did, and thereupon signed the form.

The adoption procedure had been explained to petitioner before the consent form was signed. Included in this explanation, was the fact that in an adoption proceeding the *adoption* itself is not final until six months after the adoption petition is filed. At no time was there any conversation between petitioner and the representatives of the adoption agency as to petitioner having six months, or any other time period, within which she could, upon request, get her baby back.

In accordance with the written consent, petitioner voluntarily gave her baby to the adoption agency on August 15, 1972. Subsequently, on September 1, 1972, the baby was placed in an adoptive home. During the latter part of August or early September of 1972, petitioner, her $20 expended, returned to her parents' home. On September 4, 1972, petitioner sought to have the baby returned to her and was told that the child had been placed in an adoptive home and that nothing further could be done. On September 8, 1972, petitioner sent to the adoption agency a form prepared by her attorney which purported to revoke her previously given consent. This revocation was received on September 11, 1972. Thereafter petitioner commenced habeas corpus proceedings to have the child returned to her, alleging that the consent for adoption was procured by threats, coercion and fraud.

At the hearing petioner testified that when she signed the consent form she did not realize its finality, but rather thought she could get her baby back at any time within six months. While no formal findings of fact or conclusions of law were made, the trial judge informally stated at the end of the hearing that "because of the nature of this case", he "would resolve in [petitioner's] favor the fact she was confused about the six months." The court did specifically find that the adoption agency had not engaged in threats, coercion or fraud in obtaining the petitioner's consent, and therefore denied the petition based on In re Holman's Adoption, 80 Ariz. 201, 295 P.2d 372 (1956) and In re Adoption of Hammer, 15 Ariz.App. 196, 487 P.2d 417 (1971). From this denial, petitioner has appealed on the ground that her mistaken belief that she could have her

baby back anytime within six months rendered her consent invalid.

The requirement for parental consent to an adoption is found in A.R.S. § 8–106, which states in pertinent part:

"A. No adoption shall be granted unless consent to adopt has been obtained and filed with the court from the following:

"1. From both natural parents, if living, except in the following cases:

\*    \*    \*    \*    \*    \*

"(d) Consent is not necessary from a father who was not married to the mother of the child both at the time of its conception and the time of its birth, unless the father under oath has acknowledged parentage in a document filed with the court or with the agency or division at or prior to the time the petition is filed, or unless the parentage of the father has been previously established by judicial proceedings.

\*    \*    \*    \*    \*    \*

"D. The minority of the child or parent shall not affect his competency to give consent in the instances set forth in this section."

As to the time of execution and contents of the consent, A.R.S. § 8–107 provides:

"A. All consents to adoption shall be in writing and signed by the person giving the consent and witnessed by two or more credible witnesses who are at least eighteen years of age and who subscribe their names in the presence of the person giving the consent.

"B. A consent given before seventy-two hours after the birth of the child is invalid.

"C. The consent shall be dated and shall sufficiently identify the party giving the consent and the child to whose adoption the consent is given.

"D. The consent shall designate either of the following:

"1. An agency or the division as authorized by the party giving the consent to place the child for adoption."

\*    \*    \*    \*    \*    \*

There is no contention that petitioner could not have legally consented to the adoption or that the statutory formalities were not complied with. Nor does petitioner *now* contend that her consent was brought about by fraud, duress, coercion, misrepresentation or other wrongful conduct. Her sole contention on this appeal is that the consent form itself coupled with her conversations with the welfare worker relative to the *adoption* procedure, justified her belief that she could change her mind and get her baby back within six months.

The consent form is entitled "Consent to Place Child for Adoption" and states in relevant part:

"That I have given the matter due consideration, and I believe the best interests of the child will hereby be promoted.

"NOW, THEREFORE, I do hereby *voluntarily and unconditionally consent* to the placement of my said child for adoption with the Coconino County Department of Public Welfare, P. O. Box 1966, Flagstaff, Arizona 86001 a duly authorized agency for the placing of children for adoption;

"*I hereby surrender custody and relinquish all rights which I may have in the child to said agency,* and I do hereby authorize said agency to take all necessary steps towards the adoption of the child.

"*I hereby confer absolute and unrestricted power upon the said agency to consent to the adoption of the child without further notice to me,* and with the same force and effect as though I personally gave consent at the time of adoption, and I expressly agree and pledge that I will not interfere in any way with the care, management, or adoption of the child.

"I realize that as a result of this consent to place child for adoption, and by the eventual giving of consent by the said agency, the parent-child relationship between me and the child shall, upon entry of a decree for adoption, be com-

pletely terminated and that all the legal rights, privileges, duties, obligations, and other legal consequences of said relationship, shall cease to exist, under A.R.S. Sec. 8–117." (Emphasis added).

It should be noted that the form gives *unconditional* consent to the placement of the child, and specifically states that the signer relinquishes *all rights* in the child. While the last paragraph of the form does speak in *future* terms, we are of the opinion that the form, taken as a whole, clearly indicates that the consent given is immediately effective. There is no language in the form which states or implies that the consentor may change her mind, revoke her consent and thereby regain custody of the child. Moreover, in none of the conversations between petitioner and representatives of the adoption agency was the possibility of petitioner regaining custody discussed.

Based on these conversations and the signing by petitioner of the consent form without any expressed reservations on her part, it was both reasonable and proper for the adoption agency to immediately take steps to secure placement of the child in an adoptive home. Since such placement was secured prior to petitioner's attempted revocation of consent the rule set forth in In re Holman's Adoption, *supra,* is applicable. There the court stated:

" . . . we hold that a consent once given by the parent or other persons having the authority to give such consent, may not be revoked *after the child has been placed in the possession of the adoptive parents except for legal cause shown,* as where such consent was procured through fraud, undue influence, coercion or other improper methods." 80 Ariz. 201 at 207, 295 P.2d 372 at 376. (Emphasis in original).

*See also,* In re Hammer's Adoption, *supra.*

Recognizing the rule expressed in Holman *supra,* the petitioner contends that her unexpressed misinterpretation as to the legal significance of the consent form is suf-ficient "legal cause" so as to allow her to invalidate what appears to be a voluntary and knowingly executed consent form. We disagree. In Hamer v. Hope Cottage Children's Bureau, Inc., 389 S.W.2d 123 (Tex.Civ.App. 1965), the natural mother sought to revoke her consent on the ground she had not read the consent form and thus was ignorant of its contents. The court summarily dealt with this argument stating:

"She admits that on the occasion of several visits and negotiations with Hope Cottage representatives she discussed the adoption of her children, but she does not claim that false representations were made to her. She says simply that she did not read the three documents of consent before signing them. She herself says that nothing was done to prevent her reading them. Having had full opportunity to read the documents before signing them she will not be permitted to avoid the agreements on the ground that she was mistaken as to or ignorant of their contents." 389 S.W.2d 123 at 126.

Similarly, in Myers v. Myers, 197 App. Div. 1, 188 N.Y.S. 527 (1921), the argument that since the consentor did not realize the effect of the documents he signed, his consent was invalid, was held to be without merit. There, the natural father acknowledged signing certain documents pertaining to adoption, but he maintained that the purport of the documents was not made clear to him, and that he was told and believed that his child would be returned to him any time he desired it. The court held that the father was not to be relieved of the consequences of his acts which were in compliance with the applicable adoption statutes. *See also,* Hurley v. St. Martin, 283 Mass. 415, 186 N.E. 596 (1933).

We think the policy considerations stated by the Nevada Supreme Court in Welfare Division of the Department of Health and Welfare v. Maynard, 84 Nev. 525, 445 P.2d 153 (1968), in an analogous fact

situation, are particularly pertinent. There the court stated:

" 'It is apparent that if in particular cases the unstable whims and fancies of natural mothers were permitted, first, to put in motion all the flow of parental love and expenditure of time, energy and money which is involved in adoption, and then, as casually, put the whole process in reverse, the major purpose of the statute would be largely defeated.'

\*  \*  \*  \*  \*  \*

" 'Public policy demands that the adoption act should not be nullified by a decision that causes the public to fear the consequences of adopting a child with the full knowledge that their efforts are at the whim and caprice of a natural parent.' " 445 P.2d 153 at 155.

In Batton v. Massar, 149 Colo. 404, 369 P.2d 434 (1962), the Colorado Supreme Court stated with regard to the trial court's finding that the natural mother did not realize the seriousness and finality of the papers she had signed:

*"Even though the evidence were such as to warrant the finding made, the facts recited therein are not sufficient ground for setting aside the decrees of adoption.*

"It is not the law that one may avoid the consequences of his voluntary acts, acts not induced by fraud, duress, coercion, etc., by proof that he or she:

'did not realize the seriousness and finality of the papers she [or he] was signing.'

"Such a rule of law would render every contract voidable at the whim of the maker." 369 P.2d 434 at 437. (Emphasis added).

*See* In re List's Adoption, 418 Pa. 503, 211 A.2d 870 (1965); In re Adoption of Pitcher, 103 Cal.App.2d 859, 230 P.2d 449 (1951).

In the fact situation under consideration, we do not deem it necessary to find that petitioner in fact had actual knowledge of the legal significance of the consent form which she executed. In this connection we have considered the trial judge's comment that he would resolve in petitioner's favor "the fact she was confused about the six months" as being equivalent to a finding that petitioner did in fact believe that she could change her mind and revoke her consent at any time within six months.[1] Assuming this to be the case, we find the policy considerations enunciated in the above-cited cases persuasive. Here, by signing the consent form, petitioner, a high school graduate presumably of at least normal intelligence, manifested her intent to relinquish her parental rights in clear and unambiguous terms. When asked if she understood it, she replied in the affirmative. The adoption agency had no way of knowing that she interpreted the agreement to mean other than it stated. Her signature was not obtained by fraud, duress, misrepresentations, coercion or any other wrongful behavior. The adoption agency was obligated to secure an adoptive home for the child at the earliest opportunity. The adoptive parents, whom we note were not made parties or represented here, were likewise justified in accepting the child into their home. To allow the efforts and expectations produced by, and flowing from, petitioner's conduct to be destroyed by her unexpressed misconception, which was neither the result of actions by the adoption agency nor the adoptive parents, would be contrary to the public policy manifested by our adoption statutes. The continued integrity of the adoption procedure demands that a consentor be held to the natural consequences of his or her actions, absent the presence of highly important countervailing policy considerations as discussed in Holman, *supra*.

1. We are not certain that such an assumption is required by the record. The trial judge also stated, regarding the consent form:

"THE COURT: Part of it may be confusing, I can see, like the six months and the adoption. Part of the form is not confusing such as the first paragraph which says, 'I hereby surrender custody of the child and relinquish all rights which I may have in the child to said agency.' There's not too much that's ambiguous about that terminology."

The fact that the child was in the home of the adoptive parents for only three days before petitioner expressed her desire to have him back, does not alter our conclusion. There must be some readily ascertainable event, upon which adoptive parents can be secure in the knowledge that the child in their home cannot be taken from them solely at the whim of the natural parents. As stated in Holman, *supra*, that event is when the child is first placed in the adoptive home.

The judgment of the superior court is affirmed.

JACOBSON, C. J., Division 1 and EUBANK, P. J., concur.