IN RE ADOPTION OF INFANT BOY.

(No. 1-89-16—Decided July 27, 1989.)

*Gooding, Huffman & Kelley* and *Lawrence A. Huffman,* for appellant.

*Eastman & Smith, David M. Jones, Katherine C. Jones* and *Gregory M. Novak,* for appellee.

*Per Curiam.* This is an appeal by the adoptive parents of an infant boy from a decision of the Probate Division of the Common Pleas Court of Allen County, Ohio, granting the motion of the natural mother of the infant to withdraw her consent to the adoption pursuant to R.C. 3107.09(B).

The infant boy was born on November 12, 1988. An application for private placement of the child was filed in the probate court on November 17, 1988. The following day, on November 18, 1988, a judgment entry approving the placement was filed and the child was placed in the home of the adoptive parents where he has remained to this day.

On December 14, 1988 at 9:41 a.m. a petition for adoption was filed by the adoptive parents and at 10:31 a.m. on the same day, the natural mother filed a motion to withdraw her consent to the adoption pursuant to R.C. 3107.09 (B). There were no interlocutory orders or other procedural obstacles to the withdrawal of consent under R.C. 3107.09(B). After one continuance, a hearing was held on the motion to withdraw consent on March 6, 1989.

The record in this case shows that the natural mother was a seventeen-year-old high school student living at home with her parents at the time she

became pregnant via her sixteen-year-old boyfriend. At the hearing on the motion to withdraw consent, the natural mother sought to establish, in essence, that her initial consent was involuntarily obtained under the duress of pressure from her father and that in any event, it was in the best interest of the child to be returned to his natural family. For their part, the adoptive parents challenged the claim of duress and sought to establish that it was in the best interest of the child to remain in their home.

Subsequent to the hearing, which was bifurcated to protect the identities of the parties, the probate court filed its judgment entry finding, *inter alia,* that it was in the best interest of the child to allow the natural mother to withdraw her consent. Accordingly, the court granted the motion and ordered the child returned forthwith to the natural mother. However, in the same entry (filed March 16, 1989), the probate court also found that there was *no* consent to the adoption and dismissed the adoption petition for lack of jurisdiction.

The adoptive parents now assign two errors to the decision of the probate court as follows:

"1. The trial court erred in finding that it was in the best interest of the child to be returned to his biological mother when such finding was clearly against the manifest weight of the evidence presented.

"2. The court erred in failing to apply the clear and convincing evidence standard when it examined the validity of the consent of the biological mother."

Inasmuch as the validity of the consent constitutes a threshold issue to this appeal we will first address the second assignment of error.

At the hearing on the motion to withdraw consent, the natural mother testified that she had never really wanted to give her child up for adoption but had felt compelled to do so as the result of pressure from her father. In support of this claim, she presented a number of witnesses, including her father, to establish that his initial reaction to the pregnancy was very negative and intimidating to her, primarily to the effect that he would not help her in any way to support or raise the child.

In *Morrow* v. *Family & Community Serv. of Catholic Charities, Inc.* (1986), 28 Ohio St. 3d 247, 28 OBR 327, 504 N.E. 2d 2, the Ohio Supreme Court has indicated that the consent of a natural parent to an adoption may be invalidated by a showing of duress or undue influence. *Id.* at 251, 28 OBR at 330, 504 N.E. 2d at 5. See, also, *In re Adoption of Infant Girl Banda* (1988), 53 Ohio App. 3d 104, 108, 559 N.E. 2d 1373, 1378, fn. 4. In such a case, " '[t]he real and ultimate fact to be determined * * * is whether the party affected really had a choice; whether he had his freedom of exercising his will.' " See *In re Hua* (1980), 62 Ohio St. 2d 227, 232, 16 O.O. 3d 270, 273, 405 N.E. 2d 255, 259, citing *Tallmadge* v. *Robinson* (1952), 158 Ohio St. 333, 49 O.O. 206, 109 N.E. 2d 496.

We are persuaded that once the natural mother has entered her consent to the adoption in open court, she has the burden to establish duress or undue influence by clear and convincing evidence. See *In re Adoption of Holcomb* (1985), 18 Ohio St. 3d 361, 18 OBR 419, 481 N.E. 2d 613; *Johnson* v. *Waller* (Jan. 28, 1980), Allen App. No. 1-79-24, unreported; 44 Ohio Jurisprudence 3d (1983) 450-451, Evidence and Witnesses, Section 1036; 25 American Jurisprudence 2d (1966) 408, Duress and Undue Influence, Section 48; 8 American Jurisprudence, Proof of Facts 2d (1976) 503-505, Adoption-Undue Influence, Section 10.

However, in the case before us,

despite the efforts of the natural mother to establish duress or undue influence at the hearing, the probate judge made only two findings pertaining to the issue of consent in its written decision:

"1. At no time did the biological mother wish to surrender her child for adoption, and that she felt she had no choice except to co-operate with her father and his attorney in order to [e]ffect an apparent voluntary surrender. * * *

"2. The Court finds that the consent of the biological mother to the adoption is necessary and that the mother has not consented to the adoption."

On this basis, the probate court ordered that the petition for adoption be dismissed for lack of jurisdiction. Yet, at no time did the probate court make any finding or adjudication whatsoever of either duress or undue influence beyond the bare statements quoted above. (We note at the outset that contrary to the statement that she felt she must cooperate with her father and his attorney, the attorney testified that the natural mother's consent had always appeared voluntary to him, both during meetings in his office and in open court at the placement hearing.)

Nor is there any mention of a standard of proof by which the probate court reached its conclusions regarding the consent in this case. It is true that, standing alone, we might ordinarily overlook the mere failure to mention the standard of proof based upon the presumption of regularity afforded in appellate review of such matters. However, we are not prepared to go so far as to presume that the consent was vitiated by duress or undue influence in the absence of any such finding or adjudication by the trial court.

Moreover, the finding of the probate court that there was no consent (as opposed to a possible finding that the natural mother had established that her original consent was the product of duress or undue influence) is clearly against the manifest weight of the evidence. There is no question in this case that the natural mother originally consented to this adoption, both in writing and in open court on November 18, 1988, as reflected in the judgment entry of that date. In addition, these consents were facially voluntary. The fact and the validity of the natural mother's original consent was thus supported by the documentary evidence as well as the testimony of the probate judge and attorney present at the hearing.

Finally, it is important to note that the probate court expressly *granted* the motion of the natural mother to withdraw her consent pursuant to R.C. 3107.09(B) and found that it was in the best interest of the person to be adopted to permit the withdrawal. We believe such a finding and ruling clearly presuppose that a valid, *i.e.,* voluntary, consent has been executed. See *In re Adoption of Infant Girl Banda,* *supra,* at 108, 559 N.E. 2d at 1378. It therefore seems to us that the decision to grant the motion to withdraw consent not only undermines any argument that the probate court found the natural mother had established the necessary duress or undue influence to invalidate her consent, but also serves to further undermine, as against the weight of the evidence, the finding of the probate court that there was never any consent to the adoption.

For these reasons, we find the second assignment of error is well-taken. The judgment of the probate court that that adoption petition must be dismissed for lack of jurisdiction because there was no consent to this adoption should be reversed.

We now proceed to the first assignment of error. This assignment re-

quires us to review whether the finding of the probate court that the withdrawal of consent was in the best interest of the person to be adopted is against the manifest weight of the evidence.

While there are few specific definitions of the "best interest of the child" set forth in the cases, we find helpful the following test described by Sandford N. Katz in (1966), 64 Mich. L. Rev. 756, 763, and quoted by the Supreme Court of Ohio in *State, ex rel. Portage Cty. Welfare Dept.,* v. *Summers* (1974), 38 Ohio St. 2d 144, 67 O.O. 2d 151, 311 N.E. 2d 6:

" 'We say that we expect children to be physically and emotionally secure; to become economically independent; to acquire an education and develop skills; to respect people of different races, religions, and national, social and economic backgrounds; to become socially responsible and honorable, and to have a sense of family loyalty.' " *Id.* at 152-153, 67 O.O. 2d at 156, 311 N.E. 2d at 12, fn. 8.

At the hearing on the motion to withdraw consent, the natural mother, in addition to her own testimony, presented the testimony of her parents and her grandfather, the mother of the natural father, and a licensed clinical counselor who had conducted one interview with the natural mother. Most of this testimony was directed toward explaining the course of events leading up to the original consent to the adoption.

Specifically, the evidence established that upon learning of his daughter's pregnancy, the father of the natural mother had reacted in an extremely negative fashion. This included verbally abusing the natural mother, threatening to cut off support of her if she kept the baby, and a flat refusal to consider helping to support or raise the child, particularly in view of what he perceived as the unwill-

ingness of the baby's natural father to assume some responsibility.

While this attitude continued for several weeks, the father of the natural mother apparently experienced a change of heart about the baby, in part due to pressure and persuasion from his own parents (the grandparents of the natural mother). As a result, by the time of the March 6, 1989 hearing on the motion to withdraw consent, the father of the natural mother testified that he had reconciled with the natural mother and was prepared to do whatever he could to assist her in supporting the baby. This change of heart was corroborated by the natural mother and other family members who testified at the hearing.

In addition, all of the natural mother's family who testified, including her grandfather, indicated a willingness to assist her in raising and supporting the baby. The evidence indicated that they all apparently had the financial ability to do so with the parents and grandparents of the natural mother each enjoying approximately $60,000 in earned income. The evidence further indicated that the natural mother, who was eighteen years old at the time of the hearing, planned to finish high school and enter a technical school for secretarial training.

On the other hand, while the mother of the baby's natural father testified as to her willingness to help in the support of the baby, the natural father did not testify at the hearing. Nor is there any indication in the record that the natural father intended to assume any responsibilities for this child or play any role in the child's development.

For their part, the adoptive parents testified that they had received the baby when he was six days old and by the time of the hearing had completely accepted and bonded with

the child as their own. By all accounts, the adoptive parents were presented as a very stable couple in their thirties, with professional jobs, good incomes and capable of providing an ideal family environment for a child.

In addition to their own testimony, the adoptive parents relied upon a psychologist's report, stipulated into evidence by the parties. The report was based upon interviews with the natural mother and adoptive parents and was prepared for the purpose of evaluating which persons were "* * * best able to provide for the well-being of the child." While not disparaging to the natural mother, the report nevertheless concluded that the natural mother's situation "* * * does not compare with the almost ideal situation in which the adoptive parents can raise a child."

After reciting the evidence summarized above, the probate court made the following findings with regard to the best interest of the child:

"3. After hearing on the motion, the withdrawal is in the best interest of the person to be adopted for the following reasons:

"(a) There has been a complete and sincere reversal as to the attitude of the biological mother's father towards her and her child.

"(b) The biological mother wishes to have custody of her child.

"(c) The court believes that the child's interaction and interrelationship with his parents and her father and mother as well as the child's great-grandfather will develop more naturally because of the blood relationship.

"(d) There is no reason to believe that the child will not have a good adjustment to his home school, and community as he matures.

"(e) The mental and physical health of all persons involved in the situation will be benefitted, and that in the event the child suffers an illness to which he may be a risk, his family will be more able to cope with the problems created."

Upon review of the evidence in this case, we find we are not comfortable with the findings of the probate court set forth above as sufficiently supporting a decision that it is in the best interest of the person to be adopted to be returned to the natural mother pursuant to R.C. 3107.09(B). We will address our concerns as they pertain to each of the five findings listed by the probate court.

(a) We do not challenge the prerogative of the trial judge to evaluate the credibility and sincerity of the reconciliation between the natural mother and her father. However, while this reconciliation would seem to indicate that the child's prospects with the natural grandfather are much improved over what they were prior to the reconciliation, we are not convinced that this reconciliation necessarily establishes that it is in the best interest of the child to be with the natural mother as opposed to the adoptive parents.

We are particularly disturbed by the following observations with regard to the relationship of the natural mother's father to the baby's natural mother and natural father contained in the psychological report of Steven Beck, Ph.D., stipulated to by the parties herein:

"To better understand the dynamics between * * * [the natural mother] and her father the following information is important. When * * * [the natural mother's father] was 18 years old he and his wife-to-be conceived a child (* * * [the natural mother]) out of wedlock. * * * [The natural mother's father] now proudly presents himself as a self-made and independent man who had to pull himself up by his bootstraps at that time in order to provide for his family * * *. When he and

his wife conceived [the natural mother], he immediately married and went to work to provide for his family. He states he expects the same behavior from * * * [the natural mother] and her boyfriend * * * [the natural father]. However, * * * *[the natural father], who is a year younger than * * * [the natural mother], is apparently intimidated by * * * [the natural mother's father] and at the time of my interview had not spoken to * * * [the natural mother's father] about options to keep the child. * * * [The natural mother] related that her current relationship with the father of the child is unclear. She stated that if she has the child, she is certain the father will be involved with the child's upbringing, but she is uncertain about her future relationship with him. However, * * * [the] dissatisfaction of * * * [the natural mother's father], even before they conceived a child, and the apparent intimidation experienced by the baby's biological father, appear to be major stumbling blocks in the reunification between * * * [the natural mother] and * * * [the natural father]. "* * *

"Except for * * * [the natural mother's] inability to be assertive with her father, she presents as a well-adjusted young woman. * * *" (Emphasis added.)

The report concludes with the following observations summarizing the natural mother's situation relevant to the type of family environment which she could offer her child:

"* * * In my opinion, it is not that * * * [the natural mother] is unable to care competently for her biological child, but given her age, her current lack of job skills, her ambiguous relationship with the baby's biological father, and the necessity of initial financial and emotional support from her parents, her present situation does not compare with the almost ideal situation in which the * * * [adoptive parents] can raise a child."

The case of the natural mother relies heavily upon the anticipated support of her own extended family in raising this child. Yet the fact remains that this comes down to a single mother, eighteen years of age, still living at home, planning to raise a child in an environment which is admittedly dominated by her own father (and by whom from all accounts, she is readily intimidated along with the child's natural father). Under these circumstances, it seems evident that any change of attitude on the part of the natural mother's father would have profound and potentially damaging effect upon the interests of the natural mother and her child.

All of this must be contrasted with the stable parental and family environment offered by the adoptive parents, as evidenced not only by their testimony in court, but by the following description from the report of Dr. Beck as well:

"The * * * [adoptive parents] are clearly competent, caring and loving parents. They consider the baby boy, whom they have named * * *, to be 'their child.' They are clearly bonded with the child and have provided for his needs ably since November. They both come from very close families * * *.

"* * *

"In conclusion, it is relatively easy to conclude that the * * * [adoptive parents] are presently more capable to care for their adopted child than is the biological mother. The * * * [adoptive parents] are a stable, well-adjusted, well-functioning couple who have the emotional and financial resources to provide an excellent upbringing for a child. * * *"

In view of these conclusions, which we find to be corroborated and supported in the testimonial evidence ad-

duced at the hearing on the motion to withdraw consent, we fail to see the apparent reconciliation of the natural mother with her own father as a significant factor in determining "* * * the best interest of the person to be adopted" pursuant to R.C. 3107.09(B).

(b) The probate court also sets forth the wishes of the natural mother in support of its determination of the best interest of the child. However, courts have consistently held that the mere fact that the natural mother has had a change of heart about the adoption is insufficient to revoke consent and runs contrary to public policy. See *In re Adoption of Infant Girl Banda, supra,* at 116, 559 N.E. 2d at 1384, fn. 11. In accordance with this line of authority, we believe the placement of the child in this case with the adoptive parents, their reliance upon the original consent and their subsequent bonding with the child, are significant factors weighing against permitting revocation of consent by the natural mother based solely upon her change of mind. *Id.*

We are fully aware that the position of the natural mother on this point is that due to family pressures, her original consent was equivocal and therefore her desire to have custody of the child does not really represent a *change* of heart. However, even giving her the benefit of the doubt on this claim, for the reasons stated previously, we are still convinced that the natural mother's continuing susceptibility to those very pressures, particularly from her father, weigh against and not in favor of the best interest of the child. Therefore, in either event, we are not satisfied that the wishes of the *natural mother, alone,* are a legitimate factor in this case in support of the probate court's decision.

(c) We do not believe there is any evidence in the record to show that the child's relationship and interaction with his parents, grandparents and great grandparents will develop more naturally simply because of the blood relationship as found by the probate court. Again, we do not question the prerogative of the probate court to evaluate and determine the sincerity of the natural mother's testimony or that of her family to the effect that the blood relationship is a very important factor to *them* in seeking revocation of the consent.

However, as noted earlier, the ambiguous and uncertain situation existing among the natural mother, her father and the baby's father, when contrasted with the loving and stable family situation offered by the adoptive parents (who incidently are also able to offer a positive extended family environment), would indicate, if anything, a greater potential for positive development with the adoptive parents than with the blood relation.

More importantly perhaps, we would question whether consideration of the child's potential interaction with grandparents and great grandparents as primary caregivers should be given major weight in determining the best interest of the child under R.C. 3107.09(B), particularly when contrasted with the direct parental care offered by the adoptive parents. Under these circumstances, it would seem to us that the natural mother's obvious reliance upon her extended family for care of this child must weigh against and not in favor of the best interest of the child.

(d) We do not disagree that there was ample evidence in this case that the natural mother's parents and grandparents would be capable of providing for the child's home, school and financial needs. Nevertheless, the evidence indicated no plans for the natural mother to marry the natural father and, in fact, as noted earlier, the

natural mother's father was perceived as an obstacle to the further development of any relationship between the natural mother and the natural father. Even the natural mother described her future relationship with the baby's father as unclear. As noted earlier, the natural father did not even appear at the hearing. Consequently, we must conclude that the role of the child's father in his development is uncertain at best.

We agree with the probate court that there was no direct evidence that the placement of the child within the extended family situation offered by the natural mother would be detrimental to the child's adjustment to home, school or the community. However, under these circumstances, the child's situation could also be characterized, initially at least, as that of an "illegitimate" child of a single, teenage mother, being raised and supported collectively by extended family members. Thus, in considering the best interest of the child, we also fail to see how such a situation would necessarily foster a "good" adjustment to school, home and community, particularly when contrasted with the environment offered by the adoptive parents.

(e) While the evidence did indicate that the parents of the natural mother have successfully coped with a ten-year-old child afflicted with cerebral palsy who is developmentally handicapped, there is no evidence in the record to indicate that the natural family would be more able to cope with potential health risks which may exist with the child than the adoptive family.

There was at the time of the hearing, no evidence to indicate that the child in question had any unusual health problems. However, the record shows that the adoptive mother is an experienced critical-care registered nurse. In addition, both adoptive parents testified they were fully aware of the medical problems existing with the extended biological family of the child and were prepared to assume that risk and cope with any such problems that might arise.

Thus, we find no support in the record for the conclusion of the probate court that the natural family would be more able to cope with such problems. Moreover, in view of the lack of any indication of health problems in the child, we question whether this is really a relevant factor in determining the best interest of this child in any event.

Finally, with regard to the mental and physical health of *all* persons involved, we are fully aware of the emotional trauma at stake for the natural mother and her family as well as the adoptive parents in this case. Dr. Liston, the psychologist who testified for the natural mother, spoke of the "bonding" which she felt the natural mother was experiencing even prior to the birth of the child.

On the other hand, the evidence indicates that the natural mother did not have any contact with the child upon its birth and has had no contact with the child to this date. At the same time, the testimony of the adoptive parents strongly indicated that the baby has begun definite bonding with them as his parents. Ultimately, it is the bonding of the *child* to his parents with which we must be concerned pursuant to R.C. 3107.09(B), which dictates only one consideration — that of the best interest of the person to be *adopted*.

Most certainly, any decision in this case at this point in time will not be in the "best interest" of those family members which lose the right to custody of this child. However, the fact remains that the legislature has not designated the best interests of the various family members as a proper consideration on a motion to withdraw consent and to the extent the probate

court considered those interests we believe it was in error.

In summary, we believe the findings cited by the probate court in support of its decision to allow the withdrawal of consent in this case are either not properly directed to the issue of the best interest of the person to be adopted as required under R.C. 3107.09(B) or are not supported by the evidence in this case. Accordingly, we believe the decision of the probate court on this issue is against the manifest weight of the evidence.

We therefore find that the first assignment of error is well-taken. The judgment of the probate court permitting withdrawal of the consent to this adoption, dismissing the petition for adoption and ordering the return of the child to the natural mother should be reversed and remanded for further proceedings on the adoption petition.

*Judgment reversed.*

SHAW, BRYANT and MILLER, JJ., concur.