OPINION
{¶ 1} This is an appeal from the decision of the Franklin County Probate Court denying the birthparents' motion to withdraw their consent to the adoption of Baby Doe ("child"). For the reasons that follow, we affirm.
 {¶ 2} The birthparents in this case are Ms. M. and Mr. S. ("birthparents"). Ms. M. is a permanent substitute teacher and Mr. S. works for Brown Van Storage Co. The adoptive parents are Mr. and Mrs. R. ("adoptive parents"). Mr. R. is a computer engineer and Mrs. R. is a homemaker.
 {¶ 3} The birthparents' relationship began in June 2002. About a month later, Ms. M. suspected that she was pregnant. She took a pregnancy test which confirmed the fact. The birthparents determined that abortion was not their choice; however, they made no immediate plans as to how they would care for the child, but both realized their options were either to keep the child or give it up for adoption.
 {¶ 4} Due to previous personal problems, the birthparents decided to conceal the pregnancy from their families. Ms. M. had recently filed bankruptcy due to debt she incurred from her previous boyfriend. Mr. S. had recently been convicted of drug trafficking and was on community control for the offense. Ms. M.'s parents helped her out financially with the bankruptcy situation and Mr. S.'s mother helped with his legal fees. Neither of them wished to burden their families further.
 {¶ 5} Until the eighth month of pregnancy, the birthparents took no affirmative steps to prepare for the birth. They apparently believed that their current financial situation was not conducive to raising a child and that parenthood would put a significant strain on their relationship. Ms. M. received no prenatal care until her eighth month and only then at Mr. S.'s suggestion did she make an appointment with a doctor to make sure everything was normal with the child.
 {¶ 6} On February 24, 2003, Ms. M. had an appointment with Dr. Milroy Samuels for an ultrasound. She chose Dr. Samuels from an advertisement in the yellow pages because his office was near their apartment. Upon arrival at Dr. Samuel's office, Ms. M. went to the receptionist window to fill out appropriate paperwork. One of the questions on a particular form was whether she was single. Ms. M. checked yes. After finishing the paperwork, the receptionist asked Ms. M. what she planned to do with the child after birth. Ms. M. told the receptionist she was thinking of adoption.[1] The receptionist then called out to attorney Jasmine Sornabala and informed Ms. Sornabala she may have an adoption for her, indicating the birthparents. Ms. Sornabala, the daughter of Dr. Mervyn Samuels, has an office in the same building, right next to the doctor's office.[2] Ms. Sornabala, when summoned by the receptionist, came out to meet Ms. M. and discuss her options. Ms. Sornabala testified that she was not working in her office that particular day, rather, she was visiting her mother, who was also at her husband's (Dr. Samuels) office.
 {¶ 7} Ms. Sornabala presented the birthparents with some information about adoption and gave them her business card. The birthparents discussed their financial concerns in connection with having a child and the fact that no one in their families knew about the pregnancy. Ms. Sornabala informed Ms. M. that she and Mr. S. could choose an adoptive family or that she could choose a family for them. A few days later, Ms. Sornabala gave the birthparents a "dear birth mother" letter written by the adoptive parents and, subsequently, gave the birthparents the adoptive parents' profile. The birthparents decided that the profile was satisfactory and did not request to see any other family profiles.
 {¶ 8} The adoptive parents learned of the possibility that a child may be available for adoption when Mrs. R.'s mother called them while on vacation and told them to contact Ms. Sornabala. Mr. R. finally spoke with Ms. Sornabala on March 1, 2003. Ms. Sornabala told the adoptive parents of the possibility and informed them she could recommend an attorney to represent them or she could represent them. The adoptive parents requested that Ms. Sornabala represent them. The adoptive parents signed a retainer agreement with Ms. Sornabala on March 16, 2003.
 {¶ 9} Concerned about going into labor during the school year, Ms. M. decided to be induced after discussing her concern with Ms. Sornabala. The child was born Friday, March 14, 2003. The birthparents spent Friday, Saturday and part of Sunday with the child. The birthparents testified that they bonded with the child during this time. Ms. M.'s sister turned over the child to the adoptive parents on Sunday, March 16, 2003, the same day the adoptive parents signed the retainer agreement with Ms. Sornabala. Ms. M. gave the adoptive parents several poems she prepared for the child. These poems dealt with the love Ms. M. felt for her child and the fact she had to place her for adoption.
 {¶ 10} A placement and consent hearing was held on March 21, 2003. The birthparents attended the hearing voluntarily. The birthparents testified that prior to the hearing, Ms. Sornabala informed them that she represented the adoptive parents at the hearing. The birthparents testified that although Ms. Sornabala informed them they could retain their own attorney, she said it was not really necessary since they would just be signing papers and she would be there, just sitting at a different table.
 {¶ 11} During the hearing, the magistrate informed the birthparents on more than one occasion that Ms. Sornabala represented the adoptive parents. The magistrate also informed them numerous times of their right to separate counsel. The magistrate indicated that the hearing could be postponed if the birthparents wanted counsel or if they were not quite ready to proceed and wanted to discuss their options with anyone else. The birthparents informed the magistrate that they did not wish to have separate counsel and were ready to proceed with the hearing. The magistrate ultimately approved the placement of the child with the adoptive parents, and accepted the birthparents' consent as knowing and voluntary.
 {¶ 12} Following the hearing, the birthparents experienced great sadness about their decision. Ms. M. continued to e-mail Ms. Sornabala regarding their decision and the trouble they were having accepting it. Ms. Sornabala responded and was very sympathetic towards Ms. M. Importantly, many of the e-mails indicate Ms. M.'s acknowledgement that she and Mr. S. made the right decision, out of love for the child. Ms. M. told Ms. Sornabala that she was like a mother figure to her and Mr. S. throughout the process. Ms. M. also informed Ms. Sornabala of her and Mr. S.'s decision to tell their parents about the pregnancy and adoption. The birthparents told Mr. S.'s mother first. She told them they should not have made the decision to give up the child. Ms. M.'s parents reacted similarly. The families informed the birthparents that they (the family) would have helped them had they chosen to keep the child.
 {¶ 13} Shortly after the birthparents shared the information with their respective families, the birthparents decided to try and get the child back from the adoptive parents. The birthparents retained their current attorney, Mr. Espy. On April 17, 2003, the birthparents filed a motion to withdraw their consent to the adoption. On June 30, 2003, they filed a motion to amend their withdrawal of consent to include claims of fraud and misrepresentation, including undue influence and duress. The probate court denied their motion. The court found the birthparents' consent was voluntarily made without undue influence or duress. While the court commented on the questionable techniques used by Ms. Sornabala throughout the process, it ultimately concluded that any appearance of coercion or conflict did not interfere with the birthparents' voluntary consent. The court also found that it was in the child's best interest to remain with the adoptive parents based on the factors set forth in R.C. 3107.161(B). Specifically, the court found that the child, then six months old, had bonded with the adoptive family, the child was thriving in her current placement, the adoptive parents were financially stable and able to provide stability and permanency, and both were in good health. The birthparents ("appellants") filed the instant appeal.
 {¶ 14} On appeal, appellants assert the following assignments of error:
1. The Trial Court erred when it claimed consent was freely, knowingly, and voluntarily given with a full understanding of the adoption process and the consequences of ones action.
2. The Trial Court committed prejudicial error and violated appellants' constitutional rights of due process by violating its own rules regarding the adoption process.
3. The Trial Court committed prejudicial error in its determination that the best interest of [Baby Doe] was to stay in the home of [adoptive parents].
 {¶ 15} In their first assignment of error, appellants argue their consent to the adoption was the result of undue influence and/or duress. Initially, the standard of review is whether the judgment of the probate court is supported by competent, credible evidence. In re Howard (Dec. 21, 1995), Franklin App. No. 95APF03-315. The burden was on appellants to demonstrate by clear and convincing evidence that their consent was the product of fraud and/or duress. Id. Thus, we must determine if there is competent, credible evidence to support the probate court's determination that appellants failed to show their consent was invalid. Id.
 {¶ 16} A valid consent to an adoption is one that has been freely, knowingly and voluntarily given with a full understanding of the adoption process and the consequences of one's actions.In re Adoption of Jimenez (1999), 136 Ohio App.3d 223, 227. The consent must be "of one's own volition and with full knowledge of the essential facts, and it `is generally well-established that fraud, duress, undue influence, * * * or the like will justify a court in finding that consent was not freely and voluntarily executed.'" Id., quoting In re Adoption of Infant Girl Banda
(1988), 53 Ohio App.3d 104, 108. Further, a valid consent is irrevocable and cannot be withdrawn unless, after a hearing, the court finds that the withdrawal is in the best interest of the child. R.C. 3107.084(B). Importantly, the fact that the biological parents have had a change of heart is insufficient to revoke consent. Jimenez, supra.
 {¶ 17} The conditions for court acceptance of parental consent to adoption are set forth in R.C. 3107.081. Among other things, the court is required to question the parent to determine that "the parent understands the adoption process, the ramifications of consenting to the adoption * * *. The court also shall question the parent to determine that the parent's consent to the adoption and any decisions the parent makes in filling out the form * * * are made voluntarily." R.C. 3107.081(A)(4).
 {¶ 18} Here, we find that appellants knowingly and voluntarily relinquished their rights to the child and voluntarily consented to the adoption. Prior to the consent hearing, the court assessor, Melinda Miller, met with Ms. M. to obtain a social and medical history and to inform her of her options. Ms. Miller gave Ms. M. a pamphlet that contained information on things such as food stamps, Healthy Start and guardianship as alternatives to adoption. Ms. Miller also met with Mr. S. at the hospital after the child was born to discuss similar information. Ms. Miller testified that appellants did not seem confused about their options nor did they express doubts about the plan to place the child for adoption. (Objection Hearing "OH" at 210.) Martha Leamann, a hospital social worker involved in the adoption, also testified that appellants indicated they were making the decision voluntarily and expressed no doubts. (OH at 179.) In fact, when the adoptive parents came to the hospital on Sunday to pick up the child, Mr. S. reassured the adoptive parents about their intent to place the child.
 {¶ 19} Appellants argue that Ms. Sornabala's dual representation created a conflict of interest, thereby unduly influencing their decision.[3] Appellants must demonstrate that there was a causal connection between the conflict of interest and the consent sufficient enough to render it invalid.Howard, supra. Appellants cite several examples of such dual representation and undue influence including the first encounter between Ms. M. and Ms. Sornabala where Ms. Sornabala told Ms. M. the basics regarding adoption, the fact that Ms. Sornabala assisted appellants at the placement hearing with respect to documents they needed to sign, and the numerous e-mails between Ms. M. and Ms. Sornabala. Although we agree Ms. Sornabala's actions could have been handled more professionally, it did not unduly influence appellants' decision.
 {¶ 20} At the time of the placement, Ms. M. was 24 years old with a bachelor's degree in elementary education. Mr. S. was 23 years old with a few quarters of college education. Both were intelligent individuals and in good physical and mental health. Appellants gave their consent in open court and under oath at the consent/placement hearing. Each unequivocally stated that it was their intention to place the child for adoption. The magistrate repeatedly asked them if they wished to have their own attorney or wished to talk with anyone else about the adoption. (Placement Hearing at 9, 15, 16, 23, 31, 38.) Appellants answered in the negative. The magistrate stated the following at the beginning of the consent hearing:
The purpose of the hearing today is to make sure that you understand the permanency of your decision that you make today, and that the consents that you give are freely and voluntarily given. For purposes of the record, in addition to [Ms. M.] and [Mr. S.], also present is Jasmine Sornabala, who represents the prospective adoptive parents.
Ms. Sornabala does not represent you. If you wish to have an attorney represent your interests, let me know. I'll stop the hearing and give you all the time you need to obtain separate counsel * * *.
If you need more time, I'll give you all the time you need.
You must realize that your placement of the child today is basically permanent; that once you walk out of this courtroom, you do not have an automatic ability to change your mind.
One of the documents you'll be signing today says that the adoption becomes uncontestable one year after the issuance of the final decree. That's only partially true. Once you walk out of this room, the issue becomes what is in the child's best interest.
And it's my understanding that this child is already living with the adoptive parents. And because of that, she has already begun to bond with them. And once the child begins to bond, it's very difficult, if not impossible, to convince the court it's in her best interest to take that child away from those people, whom she considers to be her parents, and return her to you, whom she considers to be a stranger.
Therefore, although the documents and the law says that the adoption becomes uncontestable one year after the issuance of the final decree, you must consider that this adoption will be uncontestable once you walk out of the courtroom.
Id. at 4-6.
 {¶ 21} Despite this information, appellants went forward with the hearing. The magistrate again warned appellants that once the hearing was over, it would be very difficult to contest the adoption. (Id. at 20.) Appellants testified that they made the decision freely and voluntarily and signed the consent forms freely and voluntarily, without pressure from anyone else. (Id. at 12, 15, 23, 29, 30, 38.) The magistrate also discussed alternatives to adoption with appellants and asked them if they wished to consider any of them. (Id. at 14, 29-30.) Appellants answered in the negative.
 {¶ 22} Subsequent to the placement hearing, Ms. M. stated in several e-mails that she and Mr. S. made the right decision. Most of these e-mails discussed appellants' decision to tell their parents and the difficulty they were experiencing. The following is an excerpt from an e-mail dated on or about March 27, 2003:
* * * We told [Mr. S's] mom last night. It actually went like we thought it would. * * * She kept asking us if we were sure about our decision. WE told her that we were and it doesn't matter know b/c everything is said and done. * * * WE told her it was in [Baby Doe's] best interest to be with [adoptive parents] no matter how much it hurts. When! Things finally calmed down she admitted that if we would have told her form the beginning tshe would have supported our decision, but she said is she would have held her and sen her she probably would have tried to change our minds. This is why we did not tel them. * * * [Sic.]
* * *
* * * Like I said, it is in [Baby Doe's] best interest and hopefully one day she will thank us for it. * * *
 {¶ 23} Another e-mail dated March 28, 2003, stated the following:
WEll last night was worse than teh other n!ght. [Mr. S.'s] mom finally got a hold of us and it was not very pleasant. She basically said that we made a big mistake and that we should have thought more about our decision. * * * She said that since we waived our rights as parents that we really do not know for sure that [adoptive parents] will send us pictures or keep us updated. She said we should have given her ownership of [Baby Doe] until we were ready. That is not what we wanted and I do not know how to make her understand [Mr. S.] and I truly believe that we made the right decision but making her understand is killing me. * * *
* * * With her constantly telling us we mad a bad choice I am really starting to believe her. * * * I love [Baby Doe] to death and I do wish I had her but this is not the right time for [Mr. S.] and I and I want his mom to understand * * * [Sic.]
 {¶ 24} Based on this evidence, we find there is competent, credible evidence to support the probate court's decision finding the consent valid. As stated previously, a change of heart is insufficient to revoke an otherwise valid consent.[4]Jimenez, supra. Here, appellants regretted their decision to place the child after they revealed the situation to their parents and found out their parents' willingness to help. It is clear to the court appellants were not subjected to undue influence or duress in consenting to the adoption. "In order for the adoptive process to function, the court must be able to come to a final decision. The court must be able to rely on the sworn testimony and evidence that is presented to it." Howard, supra. Further, although there was some question in appellants' minds as to whether Ms. Sornabala was their attorney, appellants have failed to demonstrate that this relationship unduly influenced their decision in any way. Accordingly, appellants' first assignment of error is overruled.
 {¶ 25} In the second assignment of error, appellants contend the probate court committed prejudicial error and violated appellants' constitutional rights of due process by violating its own rules regarding the adoption process. Appellants maintain the magistrate failed to comply with R.C. 3107.084(A)(4) because the magistrate's explanation was incomplete and misleading. Appellants claim that the magistrate's explanation implied that after the hearing, it would be "impossible" to contest the adoption. We disagree. The magistrate's explanation was more than protective of appellants' rights. The magistrate emphasized the fact that, although the adoption technically becomes uncontestable after one year, it is very difficult to do so after the placement because of the best interest standard. The magistrate was simply making sure appellants understood what they were doing and the permanent nature of the decision.
 {¶ 26} Appellants also argue that the adoptive parents' placement application was untimely filed under Franklin County Probate Division's Loc.R. 75.2(B), thereby depriving the probate court of jurisdiction to hear this matter. Loc.R. 75.2(B) states:
In private placement adoptions, a preplacement application in a form prescribed by the Court shall be filed by the proposed adopting parents not less than fifteen (15) days prior to placement if applicants are residents of Franklin County, Ohio, and not less than thirty (30) days prior to placement if applicants are not residents of Franklin County, Ohio.
 {¶ 27} Appellants maintain that because the preplacement application in this case was filed on March 11, 2003, only 10 days prior to the placement hearing, the local rule was bypassed and invalidates the consent. Appellants also suggest that the consent is invalid because the court did not issue a hospital release under Loc.R. 75.2(C). We disagree. We have found no case addressing whether an untimely preplacement application or failure to issue a hospital release constitutes grounds for revoking consent or that these requirements are mandatory and jurisdictional. In this case, a home study was conducted before the hearing approving the adoptive parents. The magistrate gave appellants every chance to postpone the hearing if they so wished. Appellants declined any postponement and assured the magistrate they were ready to proceed. Therefore, any alleged "early" preplacement approval or failure to strictly comply with the local rules does not affect the voluntary nature of the consents at issue. Accordingly, appellants' second assignment of error is overruled.
 {¶ 28} In the third assignment of error, appellants argue the probate court erred in finding that it was in the child's best interest to remain with the adoptive parents. As stated previously, if the consent was valid, then revocation can occur only if appellants prove it is in the child's best interest. R.C.3107.084(B). The factors to be considered in determining the best interest include: (1) the least detrimental available alternative for safeguarding the child's growth and development; (2) the age and health of the child at the time the best interest determination is made; (3) the wishes of the child in any case in which the child's age and maturity makes this feasible; (4) the duration of the separation of the child from the parent; (5) whether the child will be able to enter a more stable and permanent family relationship, taking into account the conditions of the child's current placement, the likelihood of future placements, and the results of prior placements; (6) the likelihood of safe reunification with a parent within a reasonable period of time; (7) the importance of providing permanency, stability and continuity of relationships for the child; (8) the child's interaction and interrelationship with the child's parents, siblings and any other person who may significantly affect the child's best interest; (9) the child's adjustment to the child's current home, school and community; (10) the mental and physical health of all persons involved in the situation; and (11) whether any person involved has been convicted of, pleaded guilty to, or accused of any criminal offense involving any act resulting in child abuse or neglect.
 {¶ 29} Appellants contend the probate court placed too much emphasis on the adoptive parents' financial ability and the fact that appellants lived in an "apartment" instead of a house. We find no error in the probate court's conclusion that it was in the child's best interest to remain with the adoptive parents. At the time of the hearing, the child had no contact with appellants other than the first two days following birth. Mrs. R. testified that the child is very bonded with her, Mr. R. and their seven-year-old son. The child's extended adoptive family is very supportive and has likewise bonded with her. Since the child is so young, we cannot ascertain her wishes in the matter. The adoptive parents are financially stable and currently own their own home. Mr. R. has a steady job as a computer programmer and Mrs. R. stays at home with her children. There is no issue with respect to daycare. Further, the adoptive parents apparently have a stable marital relationship and have been married for eight years.
 {¶ 30} In contrast, appellants have issues they are currently dealing with and trying to overcome. Mr. S. is on community control for a previous drug trafficking conviction. Ms. M. is recovering from filing bankruptcy due to a prior relationship. Although appellants have permanent jobs, there was evidence regarding the financial strain the child would have on them and their relationship. There was testimony that appellants are expected to pay back their families for the legal fees associated with the consent withdrawal. Importantly, we recognize that financially disadvantaged individuals can be just as good at parenting as those who are financially stable or wealthy. We do not mean to imply that financial stability is the only factor to look at in determining this type of case. However, as the magistrate warned appellants, once consent is given, it is very difficult to withdraw, particularly once the child begins to bond with the adoptive family, which happens almost immediately.
 {¶ 31} Further, appellants are not married and are living in what the probate court defined as a "temporary" residence, with Mr. S.'s mother and stepfather. Most importantly, there has been no contact, therefore no bonding, between the child and appellants since March 16, 2003. Again, the court recognizes at the conclusion of the placement hearing, the child generally begins living with the new family right away, and begins to bond. That is why the magistrate offered appellants every opportunity possible to postpone the hearing. Therefore, appellants have not demonstrated that it would be in the child's best interest to withdraw the consent and have the child returned.
 {¶ 32} We further recognize that a mother's right to give birth and parent a child is fundamental and constitutionally protected under most circumstances. However, Ohio law also allows the biological parents to give up those rights for the benefits of the child, the parents, or both. Due to the sensitive nature of adoption, procedural safeguards are put in place to ensure finality of decisions. Such procedural safeguards were satisfied in this case. Accordingly, appellants' third assignment of error is overruled.
 {¶ 33} In conclusion, appellants failed to demonstrate their consent was the result of fraud, undue influence or duress. It is clear that appellants made the decision to place the child for adoption knowingly and voluntarily. Appellants were given every opportunity to postpone the placement hearing and chose to go forward. It was appellants' choice to conceal the pregnancy from their families. It was only after they revealed their situation to their families that appellants decided to seek to withdraw their consent. Further, any alleged procedural error in the probate court was harmless and does not affect the validity of the consent. Finally, although we are very sympathetic to appellants' position, we affirm the probate court's judgment that it is in the child's best interest to remain with the adoptive parents. A significant amount of time has passed and the child has bonded with the adoptive family.
 {¶ 34} Accordingly, appellants' first, second and third assignments of error are overruled and the judgment of the Franklin County Court of Common Pleas, Probate Division, is affirmed.
Judgment affirmed.
Brown and Klatt, jj., concur.
[1] In the transcripts from the consent withdrawal hearing, there is conflicting testimony on this issue. Ms. M. either said that she was thinking of adoption and nothing else, or she said she was thinking of adoption but had not decided yet.
[2] Dr. Mervyn Samuels and Dr. Milroy Samuels are father and son, respectively, and share office space.
[3] Appellants believe that Ms. Sornabala was their attorney as well as the adoptive parents' attorney. Two hospital caseworkers testified that Ms. Sornabala represented all parties. However, it is important to note that Ms. Sornabala testified that she told appellants a few days after their initial meeting that she represented the adoptive parents. She also advised them of their right to counsel prior to the consent hearing and reminded them she represented the adoptive parents. Appellants testified that Ms. Sornabala did inform them of their right to counsel, but she also told them it was not really necessary since she would be in the courtroom.
[4] Viewing the post-hearing e-mail correspondence between Ms. M. and Ms. Sornabala, appellants felt they made the right choice. Appellants changed their minds after getting family pressure.